Good morning. I'd like to extend our appreciation to Chief Judge Jane Mastani for joining us on the bench by designation of the Chief Justice and to thank her also for the use of her facilities, her courtroom, and all the wonderful support we've already experienced from the staff here. You're welcome. Our first case this morning is W.A.R.F. v. Xenon Pharmaceuticals 07-1026-1033. Counsel? Mr. Johnson? Yes, Your Honor. May it please the Court. Mr. Johnson, before you start, can you tell us what the status is of the Seventh Circuit Appeal? Yes, the Seventh Circuit Appeal is stayed. There has been no briefing. Both parties agreed upon that. And the Seventh Circuit is getting periodic reports of the status of this case. Was the order stayed? There is. The briefing in that court is stayed. Did you submit a copy of that to this court? I don't know if there is a copy. I believe it was in one of the or more of the status reports, but I'm not certain about that. Together, the appeals by Xenon and W.A.R.F. raised at least nine issues. I certainly don't have enough time today to address all nine issues. Let's start first of all with the jurisdiction of this court. Yes, Your Honor. I think it's quite clear that this court has exclusive jurisdiction of this appeal. The reason is that there is a claim under the Bayh-Dole Act in W.A.R.F.'s complaint. They're seeking relief under that act. That's part of the Patent Act. It was placed in Title 35. Does that make it a patent statute? It is, Your Honor. It is part of the Patent Act. It's 35 U.S.C. 200-212. I believe that it's clearly part of the Patent Act. It deals with who gets the assignment of patent rights when there's federal funding for research primarily at educational and other non-profit institutions. Your claim under the Bayh-Dole Act, is that a theory that supports your claim of conversion or is it a separate claim? That's a W.A.R.F.'s claim. We don't believe that they actually have a Bayh-Dole Act claim. In fact, my client's position is that the Bayh-Dole Act claim is barred by the settlement agreement between the University of Wisconsin and my client, Xenon. But they asserted the Bayh-Dole Act claim in order to get assignment of a series of patent applications that my client had filed, which they at present separately own. And they're alleging that under Bayh-Dole Act, W.A.R.F. is entitled to an assignment of those patent applications that are pending. How does that claim arise in the past month? Well, I believe that in fact the Bayh-Dole Act is part of the patent. As part of Title 35, do we have to determine what the extent of the claims are, whether there's any infringement, or any aspect of validity of the patent? Yes. Under the Bayh-Dole Act, an educational institution receiving federal funds is entitled to an assignment of an invention. And so this goes to the question of ownership, first off. And it's entitled to that only if there's been conception and reduction to practice using federal funds. And those are certainly Patent Act questions. So in order to determine whether or not the Bayh-Dole Act applies, one must do an analysis of conception and reduction to practice. But was that raised as part of the aspect of the complaint itself by W.A.R.F., or was it just one of the elements of the conversion that was raised? No, no. They have a specific claim under the Bayh-Dole Act. And that issue was briefed and argued before the district court. And when one reads the district court's summary judgment opinion when she disposes of the Bayh-Dole Act claims, she goes through the fact that the regulations require this analysis of conception and reduction to practice. And she found that W.A.R.F. failed to meet their burden of proof on conception and reduction to practice. How does this complaint satisfy Christensen v. Kolk? Well, I think there's no question here that there is an assertion of a claim under the Patent Act that requires... Every claim, every theory has to be founded on the Patent Act. How about the fact that there's an agreement, a licensing agreement? The contract case, doesn't it? Under the Christensen case, you only reach the question of whether or not every theory has to turn on a federal claim, only when there's not a claim actually asserted. If there are claims asserted under the Patent Act, then there's no question of the fact that there's jurisdiction in this court. Let me ask you this. Just assuming that the Bayh-Dole Act doesn't do it, just assume or innuendo, are there other claims that are dependent upon substantial issues of patent law, such as the improvement theory? Or are you really hanging your hat here on just Bayh-Dole? Well, I certainly believe that the Bayh-Dole Act is dispositive of the question of jurisdiction. But that is certainly not the only issue of patent law that's involved in this case. For example, the whole question under the contract as to whether or not there are improvements, and that was another thing that they raised, depends upon an infringement analysis. Whether or not products are sold here, products are defined in the agreement as they have to infringe a patent. So there are, in fact, a number of other aspects where the outcome of this case is determined by patent law. But I believe the fact that they asserted a claim under the Bayh-Dole Act is dispositive of the jurisdictional issue. Why don't you go ahead then on one or two of the merits points? You're not going to get to nine of them. Oh, no, I never intend to. I was only going to address three of them. And the first one I want to address is whether Xenon had a right under the exclusive license agreement to license its rights separately without licensing WARF's rights. You know, WARF's brief is full of unsupported rhetoric about how wrongful Xenon's conduct was and how Xenon couldn't grant a license to its joint ownership without granting a sublicense to WARF's rights. WARF's entire argument is based upon a premise that Xenon could not separately license its interest without licensing or granting a sublicense to WARF's interest in the patents. That's directly contrary to 35 U.S.C. 262. I thought they conceded that a co-owner could grant a sublicense. I thought that their argument was that the ELA forgave it. Yes, their argument is that there was a waiver of the statutory right in the exclusive license agreement. However, before the exclusive license agreement was negotiated, WARF knew all about the statutory right. At no time in the negotiations did WARF ever raise this issue. They certainly never asked Xenon to waive its statutory rights. There's no provision in the exclusive license agreement anywhere waiving those rights. I thought the district judge decided that because Novartis got all of Xenon's interests, plural, that it had licensed WARF's rights as well. That is correct, Your Honor. That addresses the second question I was going to get to. The first question is whether or not we have a statutory right. The district court judge did not address that issue, although she said she didn't have to because she found there was a sublicense. The reason for her finding a sublicense was exactly what you said. It was that there was an assignment by Xenon to Novartis. However, post-trial, that finding was reversed. She reversed that. We brought a motion for reconsideration based on the fact that WARF raised that issue for the first time in its reply papers. The district judge agreed with us. She reversed the assignment finding. Once that assignment finding was reversed, the only basis in the summary judgment opinion for a finding we had granted Novartis a sublicense is gone. I thought she said that you sublicensed. You licensed whatever. You sublicensed what you got from WARF, but you also sublicensed. No, I guess you also assigned what you had. Yes, but she reversed that finding of an assignment. She reversed herself on the fact that they made a claim. She decided they really had and supported a claim. But is it clear that she reversed the finding of fact? Well, she reversed the finding of the assignment. And point of fact, as we pointed out, as a matter of law here, there cannot be an assignment. We licensed to Novartis only in limited fields of use, human health care and animal rights. That means that Xenon, my client, retained in the joint patent applications all rights outside the scope of those two areas. I thought she decided that the plant, et cetera, things were minor, not really the subject. She did not address that. In fact, that was brought up only for the first time post-trial because WARF raised this issue for the first time only in their reply brief. We never had a chance to even point that out. That's never addressed in her summary judgment opinion. And she did not find in her post-trial decision that, in fact, these were minor. You know, in terms of the first question, the waiver question, I think shearing is dispositive here, this court's decision. On the sublicense, I think the fact that once that assignment finding goes, there's absolutely no support in the opinion for the finding of a sublicense. And therefore, I think, you know, reversal is required here. And I'm going to reserve the rest of my time. The problem was in the jury finding that supported at all by the evidence. If, in fact, the remediatory was accepted, the jury found a million dollars in damages. And the remediatory was down to $300,000. In fact, there was no support at all. And the judge's remediatory was also wrong. The remediatory, in my view, is clearly wrong. And, in fact, when you read her opinion, she sort of says that. First off, the million was based on a claim by Wharf that they were entitled to stock that Xenon had sold. The court reversed that finding entirely and threw it out and said, in fact, she was in error when she failed to give the instruction we'd asked to, that the jury could find that was part of it only if somehow the value of the stock was inflated. She found that there was absolutely no credible evidence that, in fact, the stock value was inflated. And so that, for the most part, is entirely off the table. So the question was then, out of the $4 million, how much was Wharf entitled? She gave an instruction to the jury that Wharf had to determine was entitled to that portion of the payments that was attributable to the sublicense. And there's absolutely no evidence in the record on what that value is. And she said herself in her post-trial opinion, I can't sort it out. And that's because they failed to produce any evidence on this subject. She says, I can't determine what the correct amount is. And, therefore, she chose an arbitrary number. When you look at that number, it's 7.5% of $4 million, which is the payments we got under the Novartis license. You can only get to that number if you attribute no value to all the other things that we provided. I thought it went off on kind of a presumption or a switching of the bird, that is, because you didn't segregate financial or accounting, that you're stuck with a whole amount. I thought that's how it was resolved. It was based on this rule of uncertainty, which is not entirely applicable here. The uncertainty rule under Wisconsin law does not relieve the point of approving damages for writing a prima facie case, period. And not only does it not relieve the burden, it's applicable only to the extent the wrongdoing or the breach would have caused this. And there was no allegation by anybody in this case that we ever breached the agreement by assigning to Novartis our know-how, the 16 separate patent families, and all the other things we assigned. And therefore, the uncertainty rule has no application to the question of what was the value of those things that were rightfully transferred. Well, if you were responsible to account for the some license royalties that came back, I mean, it doesn't really matter that you properly transferred something else. You have to keep track of that which you improperly transferred. When one looks at the agreement, you will see that the only thing that we're required to report on are product sales. That's the only thing. There's a specific form that we're required to report on. The only thing that we're required to report on are product sales. Nothing else. No license fees or anything. It's the attachment to the license agreement. Let's hear it from the other side now. Thank you, Your Honor. Ms. Noel. Thank you, Your Honors. May it please the Court. This Court, sua sponte, raised an issue on jurisdiction, and that's where I would like to start. Oh, I'm sorry. It was raised in the briefs. I stand corrected, Your Honor. As the Supreme Court held in the Christensen case, a claim supported by alternative theories in the complaint may not form the basis of 1338 jurisdiction unless patent law is essential to each and every one of these theories. Here we do have a contract case. None of Worf's claims... Well, as a preliminary issue, Your Honor, the claim at issue there is for ownership. It's for a declaratory judgment, and it's a conversion claim, which are state law claims. The Bayh-Dole Act is one theory that could afford Worf relief. Worf also raised contract theories that would afford Worf the same relief. An example is the sponsor option agreement, which does not require any interpretation of any patent law. There was a research agreement in place. If the university professors discovered a discovery under that research agreement, that was, by the terms of the contract, assignable to Worf. Is there a determination of whether or not the claim to incorporate a patent application in the patent itself, covered by the Bayh-Dole Act? Is there a determination of the breadth of the claims under the Bayh-Dole Act? Under the Bayh-Dole Act, Worf would have to, and did come forward with evidence, that there was a reduction of practice using federal funds. But as we see in the Christensen case, for example, the district court's determination, its final judgment, was based on invalidating some patents. So the theories at issue, as long as there are alternative theories, such as the breach of the sponsor option agreement, that is what the court has to look to. If there are alternative theories that gets Worf the same relief as pled in the complaint, then there is no exclusive jurisdiction, in fact, no jurisdiction, within this court. But wouldn't that be kind of a claim that was based upon the Bayh-Dole Act, where the claims themselves in the patent had to be interpreted? I don't believe that the claims had to be interpreted, no, Your Honor. I'm pathetic, but what if it was? Well, if it was, and that was the only theory for relief for ownership of these patent rights, then that would be a different situation, whereas here, where there is a contract theory where no patent needs to be interpreted, and Worf has a right under the sponsor option agreement and attached assignment to the invention. Do I understand that your Bayh-Dole Act claim or theory, whatever you want to call it, relates only to Gray Keller? What he assigned? Actually, Your Honor, Dr. Gray Keller was the only UW inventor named on the patent application covering what we call the PPA invention. However, Xenon has admitted in the briefing of this case and in discovery that Dr. Miyazaki... I mean, we are talking about that particular invention, right, and your efforts to get title to whatever it was that Dr. Gray Keller was working on there. Yes, we are, but two laboratories at UW were working on this invention, and one of those inventors, it's undisputed, did not even have any sort of consulting agreement with Xenon. Let me ask about the improvements theory. There's kind of an alternative claim for jurisdiction here, and that is that substantial questions of patent law are involved in deciding whether these are improvements which would infringe what's covered in the patent application. And isn't that kind of separate and apart from the Bayh-Dole Act theory of jurisdiction? That's true, Your Honor. However, there is a third claim, and that is under the sponsor option agreement, which does not require any finding of an improvement and did not discuss... So you think there's three theories for getting title to this, I'll just call it, without talking about other people, the Gray Keller invention, right? That's correct. To match your views, there's three theories towards title there. That's correct. All right. And this Court has held on many occasions that the decision of patent ownership is one of state law as opposed to one of patent law. Now, if this Court does address the merits addressing, first, Zenon's appeal, it is true that Wharf has contended and does contend that the exclusive license agreement is, in the words of Section 262, an agreement to the contrary. However, no resolution of that issue can be dispositive of Zenon's appeal in Zenon's favor because, as the district court found, what they did license to Novartis included Wharf's rights. Can you explain to me whether that, as he was arguing, as your opposing counsel was arguing, the finding of the sub-license underlying that is this finding of the assignment of Wharf's, their ownership, their co-ownership. Right. So explain to me if that assignment finding goes, does the sub-license finding also fail? Absolutely not. Okay. How does that work? The district court did state in her opinion that the clear assignment of virtually all of Zenon's and Wharf's rights to Novartis would certainly be evidence that an interest of Wharf's was afforded to Novartis. However, the assignment issue is only of Zenon's undivided interest. The sub-license relates to Wharf's interest. And here the district court found that Wharf's interest was indeed sub-licensed to Novartis, and that's the only reasonable interpretation of the Novartis agreement. Nowhere in the agreement does it state that Zenon was only conveying its undivided interest and setting aside the interest it had in Wharf's interest by virtue of the exclusive license agreement. Indeed, Zenon, rather, warranted to Novartis that it was, quote, the owner or licensee of all rights, title, and interest in and to the Zenon patent rights and Zenon know-how license. That's found at JA 4631. Thus, the Novartis agreement specifically contemplates that some of the rights being conveyed were gained by virtue of a license. Does it matter whether or not they assigned completely their undivided interest? If they had assigned their undivided interest, would it make any difference? Well, it certainly would be an independent breach of the exclusive license agreement, which provides that Zenon did not have the right to assign its undivided interest without Wharf's consent. It's undisputed. Wharf did not consent. However, to trigger the sublicensing clause and the payment clause, all they had to do was sublicense some of Wharf's rights. Now, what they gave to Novartis wasn't just a license. They gave an exclusive license, and they only had the right to convey an exclusive license in the joint patent application by virtue of having Wharf's rights. By definition, a license to a patent application can't be exclusive unless the licensee has the right to exclude all others. If Zenon's theory is to be taken as true, what they conveyed to Novartis was an exclusive right in its interest in the joint patent application, but they separately retained Wharf's interest to sublicense to every other pharmaceutical company in the world. And if you think about it, the Novartis agreement called for $157.5 million in pre-commercial payments alone. Certainly, Novartis would not agree to a non-exclusive license for that much money when every other pharmaceutical company around the world could gain a license by virtue of Wharf's rights. I wanted to ask you a question about your other parts of your appeal. The appeal you have on the assignment issue, which was reversed. I mean, you are now a loser on that one. In the end, what do you seek? Because I don't have all of your summary judgment motion. But regard to that assignment, what's the end relief? I mean, you already got your damages on the violation of the sublicense. So on this assignment issue, what's your relief? Well, the assignment issue is an alternative theory to breach, which would and has afforded Wharf the right to damages as well as the right to terminate the exclusive license agreement. If you recall, the exclusive license… Would that be another trial of damages? No, Your Honor. Wharf does not seek any duplication in relief. If the standing on the breach and the damages holds, Wharf doesn't seek any duplication in relief. So what are you seeking with this breach of the ELA based on the assignment? What do you get from that? What we get for that is the right to terminate or damages proved at trial, which we understand is duplicative of what we have right now. Now you're marking off the right to terminate the ELA. Correct. And then what would you have? You'd have all your patent interests back. We would. Hypothetically, if you accepted the remittiture for damages, do you have the ability to go back out and challenge the amount of damages that were granted by the court under the remittiture of relief? The remittiture was for damages caused by the breach for the sub-license. If we get reversal of the assignment, Wharf would then have to establish separate damages that would be non-duplicative of the damage amount. You just said a minute ago that you are not asking for duplicative. Wharf is not asking for duplicative damages. Then that's the end of it. Then that's the end of it. Yes, Your Honor. What's the end of it on damages? There's a few open questions here, aren't there? If there's the termination issue. I'm just wondering if we're talking about more litigation here, because suppose you get a reversal on the assignment issue and then on the termination issue. If you don't win that one too, then it's not terminated and you have to do some more stuff to get it terminated, even if there was a breach, right? Excuse me, I'd have to go outside the record to explain how Wharf has given notice of termination, so the agreement is in fact terminated, unless this court reverses the decision of a finding of breach to begin with. But we have this finding of no termination yet, and you're still seeking to have that reversed so that your March 25th, we're unhappy with you letter, is the termination notice, or is it March 15th? Your Honor, it's belts and suspenders. If this court were to reverse on a finding of breach for the exclusive license agreement, under any theory that Zenon puts forward in its appeal, and this court also reversed the finding on the assignment, then Wharf would still have rights to pursue. If Wharf prevails on all of its issues, this litigation is over. Moving on to the damages issue, what Zenon's appeal is predicated on are a few fundamental misapplications of the standard of damages. Zenon's damages fail because they misapply the standard of review, they misapply Wisconsin law in cases in which there's uncertainty of proof, and they overlook the burden shifting. When Wharf made its prima facie case, if Zenon wanted a reduction or wanted to challenge any of that evidence, it was incumbent upon them at trial to do so. They did not do so. This is all determined in Wisconsin law, too, isn't it? It is, Your Honor. If we decided to transfer it to the Seventh Circuit, would the Seventh Circuit apply Wisconsin law? That is true, Your Honor. As they interpret it? That is true, Your Honor. Why is the appeal appeal? Again, Your Honor, Wharf believes that jurisdiction does not lie in this court. Wharf filed its appeal in the Seventh Circuit. The whole case was filed about diversity anyway, wasn't it? It was. It was filed on diversity, and Wharf did raise a federal question. But as this court is well aware, the parties can't stipulate or waive subject matter jurisdiction. The second federal question jurisdiction was an error on Wharf's part. Very important on the damages is Xenon cites the case Cross v. Marshfield Clinic in its brief, and counsel alluded to the holding in that where Xenon claims that the Seventh Circuit has held Wharf would have had to pick apart every other license or patent family that Xenon claims it had the right to separately license. What the Cross decision sets out is not when damage theories are acceptable, as their quote in their brief implies, but rather whether statistical studies can be used to support damage theories. If you have an expert who has a statistical study, that expert has to go through and review all the salient factors. That's simply not applicable here. And as the district court found, Xenon did breach Section 4E3 by failing to provide an accounting. The accounting provision does not provide that they only need to provide an accounting for products sold. On its face, that provision says, for all monies owed to Wharf. So we respectfully disagree with that. Finally, Wharf did present evidence to meet its prima facie case of damages. All Wharf needed to do was show how the contract damages they sought relates to the contract term, then the burden shifts. Wharf did that, 7.5% of the license fee. Wharf also had Exhibit 114, which is the sales pitch that Xenon made to Novartis. And the only piece of intellectual property mentioned is the joint patent application. And that makes sense, because the joint patent application certainly dominates over every claim in any of these other patent applications that Xenon listed. Xenon now claims that all but one family of those patents was filed after Exhibit 114 was drafted. Xenon's trying to re-weigh evidence here. As a preliminary matter, they didn't raise this argument to the jury. More importantly, they're wrong. If you look at Exhibit B and the patent applications there, Xenon lists four categories of patents. The first is the joint patent application. That obviously predates 114. The second includes patent applications that were filed prior to Exhibit 114 or claimed priority before Exhibit 114. The third is a category that had at least one that claimed priority and many shortly thereafter. Applying all reasonable inferences in Worf's favor, as it was incumbent upon the district court, as incumbent upon this court, applying all reasonable inferences in Worf's favor, Xenon knew of these other potential rights, and yet it chose just to shop the joint patent application, because that was the real thing of value. Now, Xenon did not dispute at trial. They didn't point to a single claim of any of these 16 patent applications that they claim did not fall under the umbrella of the joint patent application. All right. Thank you. We were keeping it even. We gave you the extra time because we're giving him his extra time. Thank you, Your Honor.  Mr. Johnson. Thank you, Your Honor. I'll be very brief, and I'll only address the question of the exclusive license agreement argument she made. Can we just go back to jurisdiction for a second? Yes, ma'am. She very clearly makes the argument that these are three separate theories to support the claim of conversion and that they're only separate theories and the patent part is not exclusive. I mean, it's not necessary. Can you just explain to me why you think there's a separate claim that rests on a patent theory? The Christensen case, would you go to the Supreme Court's case there? What that court held was that if there's a claim asserted under the Patent Act, that ends it. If there's no claim asserted, then you go to the question of, there's a second question of, does the rights or the outcome of any claim asserted depend upon a question of federal law? Those are two separate questions. Once you assert a claim under the federal statutes, and they said in their complaint they did it, and they claimed there was jurisdiction, 1331. This requires the court to declare that by Dole Act, any claim under it is a Patent Act claim. And it is, as I explained earlier, because you have to get into the conception of reduction to practice of all the Patent Act issues. This court has not said that yet. I believe that, in fact, there's no question that there's no precedent as to whether or not the Bayh-Dole Act is even part of the Patent Act. But I believe that it's plain that it is. The other question on jurisprudence. In your trial below, did you raise issues as to the extent of the coverage of claims on the patent? Were there any interpretations of the claims raised? It was interesting that she said that, of course, because we're the defendant. That was their case. They had the burden, and they presented absolutely no evidence on the scope of the claims, what the claims meant, no infringement analysis. She stood up here and said today the claims in the joint patent application dominate our 16 patent applications. Search the record. This court knows full well what kind of infringement analysis would be required, far better than I do. And you will not find any, not even the most initial analysis of any kind on that question. None. How is that impacted by the Gwantel v. FISA case? Our recent opinion in 2006, which we say even with infringement analysis required, does not give us jurisdiction over the termination of a license agreement. We've got a brief answer. Your time is up. Yes, very briefly. The answer is that the jurisdiction here doesn't necessarily turn solely on the infringement analysis, but on many of their contract claims, and virtually all of them, on the improvements, on whether or not they had a right to practice the improvements, and whether or not the patent applications, gray-color patent applications should be assigned, depends upon an analysis of conception and reduction to practice. Much of it goes to the question of inventorship, and these are all patent questions. All right. Thank you. Ms. Nowak. Your Honors, the question of jurisdiction is squarely handled by the Christensen decision. Worf believes counsel is wrong about if there's a claim made under the Patent Act, then you don't even get to the second step of the Christensen analysis. Worf respectfully disagrees. Moreover, Bayh-Dole isn't in and of itself a claim. It is just a theory of ownership. Worf didn't sue for a violation of the Bayh-Dole Act. It asserted that it had rights by virtue of the Bayh-Dole Act as one of three alternative theories to ownership. So Worf respectfully submits that this court just does not have jurisdiction over this appeal. Thank you. Thank you very much.